


CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 20, 2025**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 20-41418-ELM |
| JAMES GARCIA LORCA, JR., | § | |
| | § | Chapter 7 |
| Debtor. | § | |
| | § | |
| NEXTGEAR CAPITAL, INC., | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 20-04057 |
| | § | |
| JAMES GARCIA LORCA, JR., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

In this adversary proceeding, Plaintiff NextGear Capital, Inc. ("**NextGear**") has filed suit against Defendant James Garcia Lorca, Jr. ("**Lorca**"), the chapter 7 debtor in Case No. 20-41418 (the "**Bankruptcy Case**"), to seek a determination that specified portions of the Judgment Debt (as hereafter defined) owed by Lorca to NextGear is nondischargeable pursuant to section 523 of the United States Bankruptcy Code. NextGear, an entity that provided floorplan financing to

Reliance Cars Group Inc. d/b/a Reliance Mitsubishi of Fort Worth ("**Reliance**"), a car dealership, alleges in its Complaint[1] that Lorca, the part owner, officer, manager, and individual in control of the day-to-day operations of Reliance, knowingly and intentionally caused Reliance to violate certain trust provisions of the Loan Agreement that existed between NextGear and Reliance in causing Reliance to transfer collected proceeds from the sale of financed inventory to parties other than NextGear. Thus, asserting that the portions of the Judgment Debt at issue arose from Lorca's actual fraud, defalcation while serving in a fiduciary capacity, and embezzlement, and that the Judgment Debt was for willful and malicious injury by Lorca to NextGear, NextGear requests that such portions of the Judgment Debt, along with attorneys' fees and expenses incurred in connection therewith, be determined to be nondischargeable pursuant to sections 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the Bankruptcy Code.

Lorca timely filed an Answer in opposition to the Complaint.[2] While Lorca acknowledges that he is obligated to Reliance under the Judgment (as hereafter defined) on account of his guaranty of the debt owed by Reliance to NextGear, he contends that none of the grounds raised by NextGear in support of its request for a nondischargeability are valid.

Following a three-day trial, the Court took the matter under advisement. Having now considered the Complaint, Answer, the parties' Joint Stipulations,[3] the parties' respective other pretrial submissions,[4] the evidence introduced at trial, and the representations and arguments of counsel, the Court now issues its findings of fact and conclusions of law pursuant to Federal Rule

---

[1] *See* Docket No. 7 (NextGear's Amended Complaint, simply referred to herein as the "**Complaint**").

[2] See Docket No. 11 (Lorca's Amended Answer, simply referred to herein as the "**Answer**").

[3] *See* Docket No. 73 (Joint/Supplemented Pretrial Order) ¶ (b) ("Stipulated facts" – referred to herein as the "**Joint Stipulations**").

[4] *See* Docket Nos. 69, 70, 71, 74, and 81.

of Civil Procedure 52, as made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[5]

## *JURISDICTION*

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984). Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409. The proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

## *FACTUAL BACKGROUND*

### *A. Lorca's Experience in the Car Industry*

Lorca graduated from Western Illinois University in 1980 with a degree in marketing. By the time he was 26 years old, Lorca had already become the general manager of a successful dealership in Houston. Lorca then went on to serve in a variety of positions, including general sales manager and general manager, at automotive dealerships in Houston and California. Ultimately, prior to the filing of the Bankruptcy Case, Lorca had been employed in the automotive sales industry for more than 29 years. Prior to his involvement with Reliance, however, Lorca had left each of the dealerships for whom he had worked because none of them would grant him any sort of ownership stake or a share of the profits.

### *B. Lorca's Involvement with Reliance*

In early 2017, after leaving the last dealership at which he had been working and suffered a stroke, Lorca was searching for a new business opportunity. During this time frame, Asif Aziz

---

[5] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include findings of fact, they should be deemed as such.

("**Aziz**") approached Lorca to inquire about his interest in partnering with him on a new-car dealership in Texas. Aziz had been the owner and operator of several used-car dealerships in California and he was interested in expanding into new-car sales in Texas. He offered Lorca the opportunity to become a 20% owner in the new dealership that he planned to open in Texas. Though he was then living in California, Lorca was enticed by the idea of having an actual ownership stake – something he had been hoping to obtain for nearly 30 years. Consequently, he agreed.

Thereafter, Lorca contributed $125,000 in exchange for a 20% ownership interest in Reliance, the new dealership entity, and Aziz contributed $250,000 in exchange for his 80% ownership interest. Aziz also contributed additional funds after Reliance had been organized. With the new entity organized, Lorca spent the next seven months getting things ready for the new dealership. Aziz was not directly involved with the physical set up, but he sent his business associate, Alfred Grant, to assist Lorca. Together, Mr. Grant and Lorca secured a physical location for the dealership in White Settlement, Texas. Separately, Aziz and Lorca struck a deal with Mitsubishi to have Reliance serve as an exclusive Mitsubishi new-car dealership.

Prior to opening Reliance, Aziz had only operated used-car dealerships. Given Lorca's extensive experience with new-car dealerships, however, Aziz and Lorca agreed that Reliance's primary focus would be on selling new cars manufactured by Mitsubishi.

### *C. Reliance Obtains Floorplan Financing from NextGear*

Next, Aziz and Lorca needed to find a floorplan financer willing to fund the purchase of inventory at the dealership. By the time Lorca began to look for a lender, he and Aziz had agreed that Lorca would serve as Reliance's chief financial officer and general manager. Thus, it was in

that capacity that Lorca engaged in financing negotiations with NextGear, a lender with whom Aziz had an existing relationship in connection with his used-car dealerships in California.

Lorca submitted a floorplan credit application to NextGear for consideration. In the past, NextGear had worked primarily with smaller, used-car dealerships. However, NextGear was amenable to serving as Reliance's floorplan lender. As a result, Reliance and NextGear executed a Demand Promissory Note and Loan and Security Agreement, dated October 5, 2017 (including all appendices, schedules, and addendums thereto, the "**Loan Agreement**") pursuant to which NextGear agreed to provide a line of credit of up to $5 million.[6] Both Aziz and Lorca executed the Loan Agreement on behalf of Reliance. At the time of execution of the Loan Agreement, Lorca was a part owner, director, officer (CFO), and manager of Reliance.[7]

Aziz and Lorca were also required to execute respective personal guaranties in favor of NextGear. Accordingly, Lorca executed an Individual Guaranty, dated October 5, 2017 (the "**Guaranty**").[8] Lorca read and understood the Guaranty prior to executing it.[9]

***1. Relevant Terms of the Loan Agreement and Guaranty[10]***

Pursuant to the Loan Agreement, NextGear agreed to make periodic Advances to Reliance, in its sole discretion, subject to the terms and conditions of the Loan Agreement.[11] The Advances could take the form of a Floorplan Advance, meaning an Advance made with respect to a Unit of Inventory to be offered for sale, lease or rent, or leased or rented by Reliance in the Ordinary

[6] *See* Pl.'s Exh. B (Loan Agreement), at p.1; *see also* Joint Stipulations ¶ 18.

[7] *See* Joint Stipulations ¶¶ 1-8.

[8] *See* Pl.'s Exh. C (Guaranty).

[9] *See* Joint Stipulations ¶ 21.

[10] Capitalized terms used herein that are not defined herein shall have the meanings ascribed to them in the Loan Agreement.

[11] *See* Loan Agreement § 5(a).

Course of Business (*i.e.*, a new or used vehicle acquired with the financing) (such financed Units of Inventory referred to as Lender Financed Inventory),[12] or a Receivable Advance, meaning an Advance made to provide Reliance with working capital secured by a specific Receivable owned and originated by Reliance in the Ordinary Course of Business.[13] The dispute in this case is primarily focused on Floorplan Advances.

To secure the full and prompt payment all Liabilities owed by Reliance to NextGear, Reliance granted a continuing security interest in all of its assets and properties, wherever located, to NextGear.[14] NextGear properly perfected its security interest in all of Reliance's Inventory.[15] As additional security, Reliance represented, warranted, and covenanted that it would keep all Lender Financed Inventory only at Reliance's place of business and not remove any of the Lender Financed Inventory from such place for a period exceeding 24 hours unless the subject of an active daily rental agreement or such removal had previously been authorized in writing by NextGear.[16] And Reliance further represented, warranted, and covenanted that, without NextGear's prior written consent, it would not make any distribution of its property or assets, except for tax and other distributions made in the Ordinary Course of Business, made in compliance with all Laws, and that would not render Reliance insolvent or otherwise impair the ability of Reliance to satisfy its financial obligations when and as such obligations become due.[17]

---

[12] *See* Loan Agreement, Appx. A ¶ (24) (defining "Floorplan Advance").

[13] *See* Loan Agreement, Appx. A ¶ (53) (defining "Receivable Advance").

[14] *See* Loan Agreement § 2(a).

[15] *See* Joint Stipulations ¶ 25; *see also* Pl.'s Exh. A (Affidavit of Eric Brown, hereafter referred to as the "**Brown Affidavit**") ¶ 8 and Exh. A-3 thereto.

[16] *See* Loan Agreement § 4(b).

[17] *See* Loan Agreement § 4(k).

In connection with any request for a Floorplan Advance by Reliance, Reliance was required to deliver (or cause to be delivered) to NextGear the Title or MSO[18] for any Unit of Inventory (*e.g.*, new or used vehicle) financed thereby at the time of the Advance request.[19] Once Reliance had obtained the Units of Inventory acquired with the Floorplan Advance, provided Reliance was not in default, Reliance was permitted to sell such Lender Financed Inventory to bona fide buyers in the Ordinary Course of Business;[20] *provided, however*, that upon the sale of any Unit of Lender Financed Inventory, Reliance was required to – and represented, warranted, and covenanted that it would – hold all amounts received from the sale, in the form as received, in trust for the sole benefit of and for NextGear, and to remit to NextGear the amount of funds required to satisfy all amounts due and owing to NextGear by Reliance for such Unit of Lender Financed Inventory within 24 hours of the receipt of such funds by Reliance or any of its Affiliates.[21] In the event of a shortage between the payments received by NextGear with respect to the Floorplan Advance and the Liabilities relating to the Floorplan Advance, the shortage would become immediately due and payable by Reliance to NextGear.[22]

Finally, with respect to the timing of sales of the Lender Financed Inventory, the Loan Agreement required Reliance to pay for all Liabilities that concern or relate to the Floorplan Advance for such Lender Financed Inventory on or before the Maturity Date,[23] which the Loan

---

[18] An "MSO" is the manufacturer's statement of origin or other document evidencing ownership of a Unit issued by the manufacturer of the Unit. *See* Loan Agreement, Appx. A ¶ (43) (defining "MSO").

[19] *See* Loan Agreement § 5(c). A separate 7-day deadline applies to a Universal Source Purchase, but the dispute in this case does not involve Universal Source Purchases.

[20] *See also* Loan Agreement § 4(a) (Reliance's representation, warranty, and covenant to sell, lease, or rent Lender Financed Inventory only in the Ordinary Course of Business, and to not sell or otherwise dispose of any Lender Financed Inventory except as provided in the Loan Agreement).

[21] *See* Loan Agreement §§ 4(f) and 5(o); *see also* Joint Stipulations ¶¶ 26 and 48-49.

[22] *See* Loan Agreement § 5(f).

[23] *See* Loan Agreement § 5(f).

Agreement defined as the earlier of the last day of the current Period (separately defined as the number of days set forth on the applicable Advance Schedule,[24] starting with the date on which the request for the Floorplan Advance was received by NextGear in the case of a Specific Source Purchase,[25] unless an Event of Default had been declared, in which case it was the earlier of the date on which the Event of Default was declared or the date on which the Event of Default first occurred) or the date on which NextGear had declared a Maturity Event.[26] If such Liabilities were not paid by the Maturity Date, however, then provided the Maturity Date had not been accelerated and the Floorplan Avance was not in the final Period under the applicable Advance Schedule, NextGear would automatically process a Curtailment (a requested extension of the Maturity Date for an additional Period, which NextGear could approve or disapprove in its sole discretion).[27] If granted, Reliance would then be required to pay the accrued Interest associated with the Floorplan Advance, the accrued Floorplan Fee, any other accrued Floorplan Advance related fees, and a principal reduction of the Floorplan Advance, all in accordance with the applicable Advance Schedule and any applicable event sale or promotional items in effect for such Floorplan Advance.[28] If the Floorplan Advance was already in the final Period, then provided the Maturity Date had not been accelerated and Reliance had not notified NextGear that it had already disposed of the subject Unit of Lender Financed Inventory by sale or otherwise, Reliance would be deemed to have requested, and NextGear could, in its sole discretion, automatically approve and process

---

[24] *See* Loan Agreement, attached Advance Schedules. In the case of new auto purchases, the number of days was 365. In the case of retail auto purchases, the number of days varied (either 60 or 30 days) depending upon the particular Period in which Reliance was in.

[25] A "Specific Source Purchase" means any purchase or request for Advance other than a Universal Source Purchase. *See* Loan Agreement, Appx. A ¶ (61) (defining "Specific Source Purchase"). As previously indicated, the dispute in this case does not involve any Universal Source Purchases.

[26] *See* Loan Agreement, Appx. A ¶ (41) (defining "Maturity Date").

[27] *See* Loan Agreement § 5(j) and Appx. A ¶ (16) (defining "Curtailment").

[28] *See* Loan Agreement § 5(j).

an Extension with respect to the Floorplan Advance (an extension of the Maturity Date beyond the last Period stated on the applicable Advance Schedule).[29] If granted, the Period, rate of Interest, Floorplan Fee, any other fees, and the principal reduction required to be paid by Reliance for the Extension would be equal to those of the last Period, and upon the processing of the Extension, Reliance would be required to pay all such amounts in accordance with the applicable Advance Schedule and any applicable sale or promotional items in effect for such Floorplan Advance.[30]

Turning to the Guaranty, under the terms of the Guaranty, Lorca voluntarily, unconditionally, and absolutely guaranteed the full and prompt payment, when due, of all Liabilities owed by Reliance to NextGear, as well as the full and prompt performance of all of the terms, covenants, conditions, and agreements related to the Liabilities.[31] In doing so, Lorca also acknowledged that the Guaranty was a guaranty of payment and not of collection, and that his obligations under the Guaranty were absolute and unconditional.[32] Additionally, Lorca agreed to pay all expenses, including attorneys' fees and court costs paid or incurred by NextGear in endeavoring to collect on any Liabilities and in enforcing the Guaranty.[33]

***2. The Processing of Floorplan Advances and Payments in Relation Thereto***

With the lending relationship lined up, the Reliance dealership opened in October 2017. Reliance and NextGear developed a standard set of procedures, largely consistent with the terms and conditions of the Loan Agreement, for the effectuation of approved Floorplan Advances. For new-car financing, in connection with each new shipment of Mitsubishi vehicles to Reliance,

---

[29] *See* Loan Agreement § 5(j) and Appx. A ¶ (21) (defining "Extension").

[30] *See* Loan Agreement § 5(j).

[31] *See* Guaranty § 2(a).

[32] *See* Guaranty § 2(b).

[33] *See* Guaranty § 2(a).

Mitsubishi would send a Floorplan Advance Request on behalf of Reliance directly to NextGear. Then, NextGear would directly pay Mitsubishi for the cost of the Lender Financed Inventory, whereupon Mitsubishi would then send the MSOs for such Lender Financed Inventory to NextGear. For used-car financing, NextGear would fund the Floorplan Advance directly to Reliance, whereupon Reliance would use the funds to purchase the Lender Financed Inventory, and then upon receiving the Titles for the Lender Financed Inventory, Reliance would send the Titles to NextGear. In connection with the foregoing, at all relevant times Lorca was responsible for the daily operations at Reliance, he was responsible for the sales of vehicle Inventory to customers, he had the authority to acquire and purchase motor vehicle Inventory for Reliance, and he made all of the decisions with respect to the vehicles that Reliance would acquire as Inventory.[34]

Thereafter, as the Lender Financed Inventory was sold by Reliance, if the customer paid in cash, Reliance would remit the amount it owed on the Lender Financed Inventory to NextGear within 24 hours of the sale. If the customer financed the purchase, on the other hand, which was much more common (as Reliance did not offer seller financing), Reliance would have to wait for the customer's financing to come through. Thus, in those instances, Reliance would pay NextGear for the Lender Financed Inventory by the earlier of 24 hours after receiving the customer's financing or 10 days after the sale.

Approximately 90% of Reliance's sales were of new Mitsubishi vehicles. However, Reliance typically had approximately 100 new Mitsubishi vehicles and 50 used-car vehicles of various makes on its dealership lot at any given time. While Reliance obtained its new vehicle inventory directly from Mitsubishi, it procured used vehicles primarily from Aziz. Aziz had a separate process by which he would acquire used vehicles at auction in California and then ship

---

[34] *See* Joint Stipulations ¶¶ 28-29 and 31-32.

them to Reliance. Reliance also from time to time purchased used cars in Texas from Aziz's brother, Ashfaq "Rick" Aziz ("**Rick**").

At all relevant times, NextGear was Reliance's only floorplan lender. Reliance never used anyone else to finance the purchase of vehicle Inventory. While Reliance's greatest source of income came from the sale of new and used vehicles, it was not the only source of income. Particularly in the early years of the dealership when it was very successful, the dealership would also receive manufacturer incentive payments for its sales performance, often amounting to $300,000 to $400,000 per month. Reliance also collected smaller amounts on account of manufacturer rebates on new car sales.

***D. Lorca's Relationship with Aziz Deteriorates***

As Reliance grew, Lorca's responsibilities grew commensurately. Reliance had 42 employees at the peak of its operations. Lorca supervised all of them. And throughout this time frame, Lorca continued to serve as the manager of the dealership and as Reliance's CFO. Despite the expansiveness of his involvement and responsibilities, Lorca also had daily calls with Aziz to discuss the business. And Lorca did not always see eye-to-eye with Aziz.

Among other things, Lorca had concern with respect to the nature, amount, and frequency of certain payments that Aziz was directing Lorca to cause Reliance to make. He believed that the dealership needed to maintain a reasonable level of cash reserves on hand to avoid the risk of being forced to shut down the dealership. And he was concerned that Mitsubishi would not want to do business with Reliance anymore if the cash reserves dipped too low.

That said, Lorca recognized that Aziz was the majority owner and President of Reliance and was cognizant of the fact that Aziz was the one who set Lorca's compensation. Consequently, despite his concerns, between March and July 2018, Lorca caused Reliance to make the following

payments, totaling $650,000 (collectively, the "**0313 Transfers**"), to RPC Motors, a dealership owned by Aziz's brother, Rick,[35] from the primary operating account of Reliance at BBVA Compass Bank (account ending in 0313, referred to as the "**0313 Account**") into which Lender Financed Inventory sales proceeds were deposited:[36] a $150,000 payment by check on March 13, 2018; a $200,000 payment (given in two, separate $100,000 checks) on June 29, 2018; a $100,000 payment by check on July 23, 2018; a $100,000 payment by check on July 24, 2018; and a $100,000 payment by check on July 25, 2018.[37] Lorca signed each of these checks on behalf of Reliance and conveyed them to RPC Motors.[38] In exchange for the 0313 Transfers, Reliance received nothing, whether from RPC Motors, Rick, or Aziz, and RPC Motors had no existing security interest in any of the funds that would somehow otherwise serve as a basis for the payments.[39]

### *E. Lorca Learns of an Impending Garnishment and Takes Steps to Move Funds Around*

In and around the same time frame (between March and July 2018), unbeknownst to Lorca, Aziz was using Reliance and his interest in Reliance to obtain high-interest, short-term merchant cash advance loans (collectively, the "**MCA Loans**"). Lorca claims he did not know about the MCA Loans and that neither he nor Reliance received any of the MCA Loan proceeds.

On August 1, 2018, Lorca received a phone call from a friend at BBVA Compass Bank, Reliance's bank, who informed Lorca that Reliance's accounts at BBVA Compass Bank were set to be garnished within the next couple of days. Lorca would later learn that it was the MCA lenders

---

[35] *See* Joint Stipulations ¶ 54; *see also* Pl.'s Exh. O.

[36] *See* Joint Stipulations ¶¶ 35 and 56.

[37] Pl.'s Exh. L; *see also* Joint Stipulations ¶ 53.

[38] *See* Joint Stipulations ¶ 57.

[39] *See* Joint Stipulations ¶ 55.

(sometimes referred to by the parties as the "hard money lenders") who were after the funds in the accounts. But learning of the impending garnishment, Lorca immediately took action to remove some of the funds in the accounts.

For example, on August 1, 2018, Lorca transferred $300,000 from the 0313 Account ($298,708.44 of which constituted proceeds from the sale of Lender Financed Inventory that were not remitted to NextGear) to Reliance's secondary business account (account ending in 9803, referred to as the "**9803 Account**"),[40] and then further moved $121,000 of those funds (all of which constituted proceeds from the sale of Lender Financed Inventory that were not remitted to NextGear)[41] (referred to herein as the "**9803 Transfer**") to his and his wife's (Donna Lorca) personal account at BBVA Compass Bank (account ending in 1286, referred to as the "**1286 Account**").[42] The following day, on August 2, 2018, Lorca personally withdrew $85,000 of the funds from the 1286 Account (the "**$85,000 Transfer**").[43] With respect to the remaining $36,000 of the $121,000, on the same day, August 2, 2018, Lorca moved $32,000 back into the 9803 Account,[44] leaving $4,000 of the original $121,000 still remaining in the 1286 Account (the "**$4,000 Transfer**").

Also on August 2, 2018, Lorca transferred an additional $45,156.36 from the 0313 Account (all of which constituted proceeds from the sale of Lender Financed Inventory that were not

---

[40] Pl.'s Exh. H, at pp.1-9 (the "**Lorca Affidavit**") ¶¶ 12-13; Pl.'s Exh. H, Exh. 3 ("**0313 Account Statements**"), at p.63.; Pl.'s Exh. H, Exh. 4 ("**9803 Account Statements**"), at p.69.

[41] *See* Lorca Affidavit ¶ 15 (referring to "the $121,000.00 in funds that were proceeds from the sale of collateral that was financed by NextGear and for which NextGear was not repaid").

[42] *See* Lorca Affidavit ¶ 14; 9803 Account Statements, at p.69; Pl.'s Exh. H, Exh. 5 ("**1286 Account Statements**"), at p.77.

[43] *See* Lorca Affidavit ¶ 15; 1286 Account Statements, at p.77; Pl.'s Exh. M, at p.9 (copy of withdrawal slip).

[44] *See* Lorca Affidavit ¶ 15.

remitted to NextGear) to the 9803 Account as part of an $85,000 transfer,[45] and then moved $42,500 of the funds on deposit in the 9803 Account to the 1286 Account.[46] Then, on August 3, 2018, by check drawn on the account that was cashed later the same day, Lorca transferred $20,000 of the funds from the 1286 Account to his wife.[47] According to Lorca, the $20,000 was later used to cover Reliance payroll (which he claimed actually ended up costing $27,000).

### *F. The Reliance and Lorca Accounts are Garnished; Lorca Winds Up the Dealership*

On August 3, 2018, both of the Reliance accounts, as well as the Lorcas' personal account, were garnished, as follows: $66,887.96 was levied from the 0313 Account (of which $13,583 constituted proceeds from the sale of Lender Financed Inventory that were not remitted to NextGear);[48] $727,469.22 was levied from the 9803 Account (of which $694,997.26 constituted proceeds from the sale of Lender Financed Inventory that were not remitted to NextGear and that Lorca had transferred from the 0313 Account to the 9803 Account);[49] and $53,179.60 was levied from the 1286 Account (of which $4,000 constituted proceeds from the sale of Lender Financed Inventory that were not remitted to NextGear and that Lorca had transferred from the 0313 Account to the 9803 Account to the 1286 Account).[50] Thus, in total, $712,580.26 of the funds garnished on August 3, 2018, constituted proceeds from the sale of Lender Financed Inventory that were not remitted to NextGear, and taking into account additional levies that took place over the ensuing days, a total of $744,739.36 in garnished funds from the accounts constituted proceeds from the

---

[45] *See* Lorca Affidavit ¶¶ 16-17; 0313 Account Statements, at p.63-64; 9803 Account Statements, at p.69.

[46] *See* Lorca Affidavit ¶ 18; 9803 Account Statements, at p.69; 1286 Account Statements, at p.77.

[47] *See* Pl.'s Exh. M, at p.10.

[48] *See* Lorca Affidavit ¶¶ 25-26.

[49] *See* Lorca Affidavit ¶ 23.

[50] *See* Lorca Affidavit ¶¶ 27-28.

sale of Lender Financed Inventory that were not remitted to NextGear (collectively, the "**Garnished Lender Financed Inventory Proceeds**").[51]

Within a week of the accounts being garnished, Reliance stopped operating. Lorca continued working with the dealership, however, and personally paid the dealership's controller, Christine Esquibel ("**Esquibel**"), to stay and help him wind up the business. Part of this process included helping NextGear track down vehicles that it had been financed, but that were not accounted for in their system. These vehicles were referred to as collateral unverified ("**CUV**").[52] In addition to the CUV vehicles not being accounted for, NextGear was also concerned that Reliance had several vehicles sold out of trust ("**SOT**").[53]

Lorca and Esquibel worked quickly to help NextGear identify the CUV vehicles, but they had no answers for the SOT vehicles. Importantly, CUV vehicles and SOT are not the same. An SOT vehicle is a vehicle known to have been sold, but without remitting the amount of the sales proceeds owed to NextGear. A CUV vehicle, on the other hand, is a vehicle that is not believed to have been disposed of yet, but for which its whereabouts are unaccounted.

Ultimately, Lorca and Esquibel successfully tracked down most of the CUV vehicles, but the SOT vehicle problem was substantial.[54] Once NextGear confirmed that there were, in fact, SOT vehicles, it declared a default under the Loan Agreement. In the end, Reliance, with the consent of NextGear, sold all of its remaining assets, including its remaining vehicle Inventory, to

---

[51] *See* Lorca Affidavit ¶ 29.

[52] A CUV vehicle is a vehicle that is unaccounted for; it may have been on a test drive, getting repairs, or in transit, and was not yet sold to a consumer.

[53] A vehicle would be considered SOT if it was a vehicle that NextGear had financed, that Reliance sold to a consumer, but then failed to provide payment to NextGear after receiving the proceeds from the consumer.

[54] *See* Def.'s Exh. 10.

another dealership – Fort Worth Mitsubishi.[55] Even after the sale, however, NextGear was owed in excess of $5 million.

### *G. NextGear Pursues Collection of the Amounts Owed*

In 2018, NextGear initiated litigation (the "**State Court Case**") against Reliance, Lorca, and Aziz in Texas state court (the "**State Court**") to pursue collection of the amounts due under the Loan Agreement (in the case of Reliance) and the guarantees (in the case of Lorca and Aziz): *NextGear Capital, Inc. v. Reliance Cars Group Inc., et al.*, Cause No. 342-303774-18, 342nd Judicial District Court, Tarrant County, Texas.[56] In connection with the case, NextGear determined that, as of January 7, 2019, Reliance and Lorca remained indebted to NextGear in the amount of $5,495,319.80, excluding costs and attorneys' fees.[57] As of the same date, approximately $5.2 million of such total was on account of new-car Floorplan Advances (as opposed to used-car Floorplan Advances).[58]

On January 16, 2019, the State Court entered a default judgment against Lorca and Aziz (the "**Judgment**").[59] Pursuant to the Judgment, the State Court awarded the following amounts to NextGear against Lorca and Aziz, jointly and severally: (a) $5,495,319.80 in damages, plus pre-judgment interest thereon between August 16, 2018 and January 16, 2019 at the rate of 6.0% per annum, and post-judgment interest thereon at the rate of 5.0% per annum until paid; (b) attorneys' fees in the amount of $20,000, plus post-judgment interest thereon at the rate of 5.0% per annum

---

[55] *See generally* Pl.'s Exh. P.

[56] *See* Bankruptcy Case, Proof of Claim No. 2-1 (proof of claim filed by NextGear, referred to herein as the "**NextGear POC**") (attached copy of State Court Judgment). The Court takes notice of the NextGear POC, which was signed under oath and has never been objected to by Lorca or any other party in interest in the Bankruptcy Case.

[57] *See* Brown Affidavit ¶ 10.

[58] *See* Pl.'s Exh. E, at pp.1-19.

[59] *See* NextGear POC (attached copy of Judgment).

until paid (such amount, including the accrued interest thereon, referred to as the "**Judgment Fees**"); and (c) costs of court (the total outstanding and unpaid amount of the debt owed by Lorca to NextGear pursuant to the Judgment, including accrued and unpaid interest, awarded Judgment Fees, and costs of court, referred to herein as the "**Judgment Debt**").[60]

Subsequent to entry of the Judgment, NextGear entered into a broad settlement with Aziz. But it appears that nothing was paid to NextGear on account of the Judgment; instead, it appears that any payment made was in relation to Aziz's separate California dealerships. In that regard, it appears that Aziz also had an SOT problem with NextGear in California. Separately, following entry of the Judgment, NextGear, with some cooperation from Lorca, managed to secure $1,155,692.70 in payments that were applied against the outstanding debt under the Judgment.[61] Nevertheless, Lorca continued to face substantial liability to NextGear under the Judgment.

### *H. Lorca Files for Bankruptcy Protection*

Consequently, on April 10, 2020 (the "**Petition Date**"), Lorca filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, thereby commencing the Bankruptcy Case. He filed the Bankruptcy Case with the objective of obtaining a discharge of the remaining debt owed to NextGear pursuant to the Judgment.

On March 9, 2021, NextGear filed its proof of claim in the Bankruptcy Case to assert a claim against Lorca in the amount of $4,758,980.93 based upon the Judgment and Guaranty, and after taking into account the credits noted above (the "**NextGear Claim**"). To date, no objection

---

[60] *See* Judgment.

[61] *See* NextGear POC (attached reconciliation and supporting detail regarding payments received and applied).

has been lodged to allowance of the NextGear Claim and, thus, it is deemed allowed for purposes of this proceeding.[62]

In relation to the SOT problem, after a review of relevant underlying loan documentation by Eric Brown ("**Brown**"), NextGear's Senior Manager of Risk and Recovery, NextGear determined that a total of 135 vehicles constituting Lender Financed Inventory were sold out of trust for which NextGear has still never received payment (collectively, the "**SOT Vehicles**").[63] According to Brown, the total payoff amount owed to NextGear on account of the SOT Vehicles is $2,796,804.12 (the "**SOT Vehicle Debt**").[64] Importantly, however, the Court was never presented with sufficiently reliable evidence of the amount of the *sales proceeds* received by Reliance on account of the SOT Vehicles that were never remitted to NextGear.

In this regard, first, with respect to the SOT Vehicle Report presented to validate the SOT Vehicle Debt, while it accurately reflects the principal amount of the *Floorplan Advances* made by NextGear to Reliance for the acquisition of the SOT Vehicles, it does not detail the *sales proceeds* received on account of the SOT Vehicles.[65] Second, with respect to the separate summary of Texas Department of Motor Vehicles Title application records presented to the Court, the following problems were discovered.[66] First, the column of the summary relied upon by NextGear ("Sales

---

[62] *See* 11 U.S.C. § 502(a) (a properly filed proof of claim is deemed allowed unless a party in interest objects). The Court notes that a few errors appear to have been made in formulating the NextGear POC. Among other things, the attachment to the proof of clam refers to application of a pre- and post-judgment interest rate of 8% per annum, whereas the Judgment provided for a pre-judgment rate of 6% and a post-judgment rate of 5%. Additionally, the credits reflected include NextGear's receipt of a payment of $72,860.40 on May 8, *2019*, whereas the attached detail to the summary reflects the payment as having been received on May 8, *2020*. Ultimately, because the amount asserted by NextGear as owing as of the Petition Date ($4,758,980.93) is slightly less than the amount determined by the Court through the same date, the Court will not further address the impact of the discrepancies herein.

[63] *See* Brown Affidavit ¶¶ 13-14 and Exh. A-5 thereto (the "**SOT Vehicle Report**"). An additional copy of the SOT Vehicle Report alone was introduced into evidence as Pl.'s Exh. F.

[64] *See id.*

[65] *See* SOT Vehicle Report (the column titled "Written Off Principal," which reflects a total equal to the amount of the SOT Vehicle Debt, refers to the principal amount of the Floorplan Advance made in relation to each the SOT Vehicles).

[66] *See* Pl.'s Exh. G.

Price") is really just the agreed upon starting sales prices *charged* by Reliance; it is not an indicator of the sale *proceeds* actually received by Reliance. In looking at the detailed records for the individual transactions themselves,[67] there are many instances, for example, where the customer was provided a trade-in allowance against the sales price, resulting in a smaller net payable amount to the dealership.[68] Second, during the course of trial, there were also certain inaccuracies discovered, resulting in NextGear conceding that certain of the vehicle entries should just be ignored.[69] Importantly, it is not the Court's job to sift through hundreds of pages of materials to determine to what extent summary evidence presented is accurate/inaccurate. What is clear, however, based upon the parties' stipulations and Lorca's own affidavit testimony, is that at least $829,739.36 in sales proceeds from Lender Financed Inventory were never remitted to NextGear (comprised of the $85,000 Transfer and the $744,739.36 in Garnished Lender Financed Inventory Proceeds) (collectively, the "**Misapplied Sales Proceeds**").

## ***DISCUSSION***

### ***A. Nondischargeability Under Section 523(a)(2)(A) of the Bankruptcy Code***

Section 523(a)(2)(A) of the Bankruptcy Code provides that a discharge under section 727 of the Bankruptcy Code does not discharge an individual from any debt for money or property to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's and an insider's financial condition.[70] NextGear asserts that $771,000 of the Judgment Debt – equating to the amount of the 0313 Transfers and 9803 Transfer – is

[67] *See* Pl.'s Exh. K.

[68] *Compare, e.g.*, Pl.'s Exh. G, at p.1 (line 1: referring to sale of 2018 Mitsubishi Outlander GT to the Eysermans for a sales price of $31,400) *with* Pl.'s Exh. K, at p.4 (title registration application, reflecting that a trad-in allowance of $5,450 was provided, resulting in a net sales price of $25,950).

[69] NextGear conceded that at least three different entries on the schedule should be disregarded.

[70] 11 U.S.C. § 523(a)(2)(A).

nondischargeable under the "actual fraud" prong of § 523(a)(2)(A). In relation to such argument, NextGear has the burden of proving nondischargeability under § 523(a)(2)(A) by a preponderance of the evidence.[71]

The operative terms "false pretenses," "false representation," and "actual fraud" have been described by the Supreme Court as "carry[ing] the acquired meaning of terms of art. They are common-law terms, and ... imply elements that the common law has defined them to include."[72] In *Husky International Electronics, Inc. v. Ritz*, the Supreme Court explained that "actual fraud," having been added by Congress as an additional basis for nondischargeability under the Bankruptcy Code, encompasses conduct that goes beyond fraud by misrepresentation.[73] Key to an assessment of actual fraud is whether both aspects of the phrase – "actual" and "fraud" – exist. "Actual," in the context of common law fraud, denotes any type of fraud that involves moral turpitude or intentional wrongdoing. A determination of implied fraud based upon factors independent of the debtor's state of mind, for example, will not suffice.[74] "Fraud," while generally connoting some form of deception or trickery, is more fluid in nature, depending upon the facts and circumstances of the case. It can include, for example, a transfer of assets designed to impair a creditor's ability to collect on a debt.[75]

Importantly, however, "the mere existence of a fraudulent conveyance scheme in itself is insufficient for a finding of nondischargeability."[76] A debt for money or property is only

---

[71] *Saenz v. Gomez* (*In re Saenz*), 899 F.3d 384, 394 (5th Cir. 2018); *AT&T Universal Card Servs. v. Mercer (In re Mercer*), 246 F.3d 391, 403 (5th Cir. 2001).

[72] *Field v. Mans*, 516 U.S. 59, 69 (1995).

[73] *See Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016).

[74] *See id.*

[75] *See id*.

[76] *Chowdary v. Ozcelebi* (*In re Ozcelebi*), 640 B.R. 884, 898 (Bankr. S.D. Tex. 2022) (citing *Husky*, 578 U.S. at 366).

nondischargeable under section 523(a)(2)(A) in such context if actually obtained by, or at least "traceable to," the fraudulent conveyance.[77] Thus, courts have been reluctant to make a determination of nondischargeability under § 523(a)(2)(A) where the debtor transferor was not also the transferee, in whole or in part, of the fraudulently transferred asset.[78]

With the foregoing in mind, NextGear claims that an amount of the Judgment Debt equal to the 0313 Transfers and 9803 Transfer should be determined to be nondischargeable under § 523(a)(2)(A) because the 0313 Transfers and 9803 Transfer were designed to impair NextGear's ability to collect such funds, which were subject to the trust provisions of the Loan Agreement – making the transfers "fraudulent" in nature – and that Lorca caused the transfers to be made with the knowledge that the funds were required to be maintained in trust for the benefit of, and transferred solely to, NextGear – evidencing the "actual" fraudulent conduct of Lorca. Lorca takes issue with both the reasoning and factual predicates for such argument. The Court agrees, in part.

With respect to the 0313 Transfers (totaling $650,000), it is undisputed that none of the transfers was directly or indirectly made to Lorca. They were, instead, all made to RPC Motors. Additionally, while NextGear successfully established that each of the 0313 Transfers came from the account into which proceeds from the sale of Lender Financed Inventory were deposited,

---

[77] *See Husky*, 578 U.S. at 365 ("It is of course true that the transferor does not 'obtai[n]' debts in a fraudulent conveyance. But the recipient of the transfer – who, with the requisite intent, also commits fraud – can 'obtai[n]' assets 'by' his or her participation in the fraud. If that recipient later files for bankruptcy, any debts 'traceable to' the fraudulent conveyance will be nondischargable under § 523(a)(2)(A). Thus, at least sometimes a debt 'obtained by' a fraudulent conveyance scheme could be nondischargeable under § 523(a)(2)(A). Such circumstances may be rare because a person who receives fraudulently conveyed assets is not necessarily (or even likely to be) a debtor on the verge of bankruptcy, but they make clear that fraudulent conveyances are not wholly incompatible with the 'obtained by' requirement.") (citations and footnote omitted); *see also Prado v. Erickson (In re Erickson)*, 584 B.R. 816, 819-20 (Bankr. W.D. Tex. 2017).

[78] *See, e.g., Collins v. Zolnier* (*In re Zolnier*), No. 21-20260, 2021 WL 5778461, at *3 (5th Cir. Dec. 6, 2021) (explaining that the transferor does not "obtain" debt in a fraudulent conveyance; instead, only the recipient of the transfer can obtain assets by his or her participation in the fraud) *cert. denied*, 143 S. Ct. 92 (2022); *SE Property Holdings, LLC v. Green (In re Green)*, 968 F.3d 516, 521 n.13 (5th Cir. 2020); *Michelena v. Michelena* (*In re Michelena*), 641 B.R. 325, 336-37 (Bankr. S.D. Tex. 2022).

NextGear failed to establish that the 0313 Transfers were traceable to such proceeds or the amount of the proceeds required to be paid to NextGear under the Loan Agreement's trust provisions. In this regard, Lorca explained that Reliance also had funds in the 0313 Account from time to time that were not payable to NextGear, such as the amount of the leftover sales proceeds from a vehicle sale after payment of all Liabilities associated with the vehicle had been made to NextGear. Additionally, the account contained dealer incentives and rebates paid to Reliance from Mitsubishi, which in certain instances amounted to hundreds of thousands of dollars. Thus, it cannot be said that any portion of the Judgment Debt was necessarily for money or property obtained by, or even traceable to, to the 0313 Transfers. Consequently, NextGear's § 523(a)(2)(A) claim, to the extent tied to the 0313 Transfers, will be denied.

With respect to the 9803 Transfer ($121,000), however, NextGear has established sufficient grounds for the nondischargeaiblity of $89,000 of the Judgment Debt. First, with respect to Lorca's state of mind, NextGear successfully established at trial that Lorca was well aware of both the trust and 24-hour payment obligations of the Loan Agreement. Lorca was also well aware of his guaranty of Reliance's full and prompt performance of all of the terms, covenants, conditions, and agreements related to the Liabilities under the Loan Agreement pursuant to his Guaranty. Despite such knowledge, instead of immediately transferring the $121,000 to NextGear in accordance with the Loan Agreement, he caused the funds to be moved from the Reliance 0313 Account to the Reliance 9803 Account, and then from the Reliance 9803 Account to his personal 1286 Account. This establishes the actually fraudulent nature of his conduct. And while Lorca attempted to suggest at trial that he was not aware of any amount being owed to NextGear at the time of the transfer, the Court did not find such testimony to be credible, particularly given his own earlier

affidavit testimony that the full amount of the $121,000 constituted sales proceeds from Lender Financed Inventory that had not been paid to NextGear.

With respect to the question of whether $121,000 of the Judgment Debt is fully traceable to the 9803 Transfer, however, the record is more murky. First, Lorca points to the fact that he re-transferred $32,000 of the 9803 Transfer back to Reliance the day after the 9803 Transfer was made to his personal 1286 Account. And while Lorca thereafter transferred another $42,500 from the 9803 Account to his personal 1286 Account, NextGear failed to successfully establish that $32,000 of such amount constituted the same $32,000 that had been re-transferred to the 9803 Account. In this regard, prior to transfer of the $42,500, Lorca has caused another $85,000 to be transferred from the 0313 Account to the 9803 Account. Thus, the subsequent $42,500 transfer could have come from the new $85,000.[79]

With respect to the remainder of the original $121,000 in funds, totaling $89,000, the record is clear that Lorca personally withdrew $85,000 of such amount from the 1286 Account (the $85,000 Transfer), leaving the $4,000 Transfer. And the record is equally clear that Lorca never took steps to transfer the $85,000 or the $4,000 to NextGear or to re-transfer such funds back to Reliance. As a result, to the extent of the $85,000 Transfer and $4,000 Transfer, NextGear successfully established the fraudulent nature of the 9803 Transfer.

Based upon the foregoing, because Lorca knowingly and wrongfully deprived NextGear of $89,000 of the 9803 Transfer by transferring such funds to himself, and thus the Judgment Debt owed by Lorca to NextGear necessarily includes such amount providing the necessary linkage for

---

[79] For the same reason, it is unnecessary to consider the parties' respective arguments with respect to the $20,000 that made its way into the hands of Lorca's wife. The $20,000 payment could have come from the new $42,500 that Lorca transferred from the 9803 Account. Importantly, with respect to all of the funds that were transferred to Lorca's personal account, NextGear only asserted the § 523(a)(2)(A) claim in relation to the initial $121,000 9803 Transfer. Therefore, the Court has similarly contained its consideration to that transfer alone.

purposes of § 523(a)(2)(A), the Court finds that $89,000 of the Judgment Debt is nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code.

***B. Nondischargeability Under Section 523(a)(4) of the Bankruptcy Code***

Section 523(a)(4) of the Bankruptcy Code provides that a discharge under section 727 of the Bankruptcy Code does not discharge an individual from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.[80] Pursuant to § 523(a)(4), NextGear seeks a determination of nondischarcheability of $3,567,804.12 of the Judgment Debt. In particular, NextGear specifically points to defalcation in a fiduciary capacity and embezzlement as separate grounds for nondsichargeability under § 523(a)(4). NextGear has the burden of proving nondischargeability under section 523(a)(4) by a preponderance of the evidence.

***1. Defalcation While Acting in a Fiduciary Capacity***

Defalcation is a broad term that can be described as, among other things, a breach or willful neglect of a fiduciary duty in relation to property held in trust, even if not accompanied by fraud or embezzlement.[81] To bar discharge, the complainant must first establish the existence of a trust and the property thereof, and that the debtor was acting in a fiduciary capacity in relation to such trust property at the time of the alleged defalcation.[82] If satisfied, the Court must then determine whether the debtor breached or willfully neglected his fiduciary duty.

In relation to the first requirement, the determination of the existence of a trust and fiduciary status for purposes of § 523(a)(4) is governed by federal common law instead of state

[80] 11 U.S.C. § 523(a)(4).

[81] *See NextGear Capital, Inc. v. Rifai* (*In re Rifai*), 604 B.R. 277, 322 (Bankr. S.D. Tex. 2019) (citing *Bullock v. BankChampaign*, *N.A.*, 569 U.S. 267 (2013) and *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 184 (5th Cir. 1997)).

[82] *Red Honor Ventures, Ltd. v. Edmonds* (*In re Edmonds*), Adversary No. 14-4027, 2019 WL 4780921, at *10 (Bankr. N.D. Tex. Sept. 30, 2017).

law.[83] Under federal law, the concept of a fiduciary for § 523(a)(4) purposes is narrowly defined, applying only to technical or express trusts.[84] "[T]he trust obligations necessary under section 523(a)(4) can arise pursuant to a statute, common law or a formal trust agreement."[85] In this regard, NextGear asserts that an express trust was established pursuant to the Loan Agreement and that Lorca was bound to the trust and fiduciary obligations set forth therein by virtue of his position of control at Reliance and the terms of his Guaranty. Lorca disputes the same. The Court agrees with NextGear.

Here, the Loan Agreement expressly stated that proceeds from the sale of Lender Financed Inventory were to be held in trust for NextGear's benefit, with all Liabilities associated with such Lender Financed Inventory to be paid from such trust funds within 24 hours of Reliance's receipt of the proceeds. The trust provisions of the Loan Agreement are set out in two different places - §§ 4(f) and 5(o). Pursuant to the Guaranty, Lorca guaranteed the full and prompt performance of all the terms, covenants, conditions, and agreements related to the Liabilities. Thus, based upon the plain language of the Loan Agreement and the Guaranty, an express trust was established with respect to the amount of the sales proceeds received by Reliance in relation to the Lender Financed Inventory, and Lorca was bound to a fiduciary duty in relation thereto.

Turning next to the question of whether Lorca breached or willfully neglected his fiduciary duty to NextGear in relation to trust property, it is first necessary to determine the trust property at issue. In this regard, while NextGear asserts that the amount at issue under the § 523(a)(4) claim is $3,567,804.12, it failed to anchor such amount to any reliable evidence. At trial, a variety of

---

[83] *LSP Inv. P'ship v. Bennett* (*In re Bennett*), 989 F.2d 779, 784 (5th Cir.), *amended on other grounds*, 1993 WL 268299 (5th Cir.), *cert. denied*, 510 U.S. 1011 (1993).

[84] *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998), *cert. denied*, 526 U.S. 1016 (1999).

[85] *Bennett*, 989 F.2d at 784.

different amounts were discussed. Ultimately, however, under the terms of the Loan Agreement, only the *actual proceeds* of Lender Financed Inventory were subject to the trust, and only the amount of such proceeds that were *misused, misapplied, or otherwise lost* is proper for consideration. Thus, with this in mind, what NextGear did successfully establish is that the Misapplied Sales Proceeds (*i.e.*, the $85,000 Transfer paid to Lorca and the $744,739.36 in Garnished Lender Financed Inventory Proceeds levied by the MCA lenders (which includes the $4,000 Transfer)) held in trust for the benefit NextGear were misused, misapplied, or otherwise lost.

Having now determined that the Misapplied Sales Proceeds constitute the trust property at issue, it is necessary to consider whether Lorca's breach or willful neglect of his fiduciary duty to NextGear resulted in the misuse, misapplication, or loss of the Misapplied Sales Proceeds. NextGear asserts that there was such a breach and willful neglect; Lorca disputes the same. The Court agrees with NextGear.

In the case of the $85,000 Transfer, for the same reasons as set out above in the § 523(a)(2)(A) analysis, Lorca also breached his fiduciary duty to NextGear in making the $85,000 Transfer. In short, Lorca intentionally moved the $85,000 out of the Reliance accounts and into his own hands to prevent anyone, including NextGear, from ever reaching it. Next, in the case of the Garnished Lender Financed Inventory Proceeds, the question is a little more complex because of the fact that the misuse/misapplication/loss was not effectuated by Lorca himself, but rather by the levy directed by the MCA lenders. Ultimately, however, the Court finds that NextGear successfully established that Lorca willfully neglected his fiduciary duty to NextGear in relation to such funds.

In this regard, as previously explained, Lorca clearly knew about and understood the obligation under the Loan Agreement to transfer all received sales proceeds associated with Liabilities owed in relation to Lender Financed Inventory to NextGear within 24 hours of their receipt. By his own affidavit testimony, Lorca has verified that the Garnished Lender Financed Inventory Proceeds constituted sales proceeds from Lender Financed Inventory that were owed to NextGear and never paid to it. With those facts in mind, it was also established that Lorca had more than 24 hours' notice from BBVA Compass Bank before the Reliance accounts at the bank were frozen and garnished by the MCA lenders. During that bubble period, Lorca could have transferred the Garnished Lender Financed Inventory Proceeds to NextGear or otherwise coordinated with NextGear to transfer the proceeds to an account outside of BBVA Compass Bank where they would have been protected for the benefit of NextGear. Instead of doing so, Lorca went about the process of moving funds around from account to account without alerting NextGear. At a minimum, such conduct constituted the willful neglect of his fiduciary duty to NextGear resulting in NextGear's loss in the amount of the Garnished Lender Financed Inventory Proceeds.

Based upon the foregoing, because Lorca's breach or willful disregard of his fiduciary duty to NextGear (*i.e.*, defalcation while acting in a fiduciary capacity) in relation to the $829,739.36 in Misapplied Sales Proceeds deprived NextGear of such proceeds, and the Judgment Debt owed by Lorca to NextGear necessarily includes such amount, the Court finds that $829,739.36 of the Judgment Debt is nondischargeable pursuant to the defalcation provisions of § 523(a)(4) of the Bankruptcy Code.

### *2. Embezzlement*

For purposes of section 523(a)(4) of the Bankruptcy Code, federal law controls the meaning of embezzlement.[86] Embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."[87] A creditor proves embezzlement by showing three elements: "(1) appropriation of funds by the debtor; (2) for the debtor's use or benefit; and (3) with fraudulent intent."[88]

Here, the Court can quickly narrow the focus based upon the second element – for the debtor's use or benefit. In relation to the various categories of sales proceeds subject to the trust provisions of the Loan Agreement, the only sales proceeds that were appropriated by Lorca for his own use or benefit were the $85,000 in funds that he transferred from the Reliance accounts to his personal account and then withdrew from the personal account. In relation to such funds, as indicated above in the context of the § 523(a)(2)(A) claim, Lorca failed to present any convincing rebuttal evidence indicating that such funds were not put to his own use or benefit. Therefore, on the basis of embezzlement, $85,000 of the Judgment Debt is also nondischargeable under the embezzlement provisions of § 523(a)(4) of the Bankruptcy Code.

### *C. Nondischargeability Under Section 523(a)(6) of the Bankruptcy Code*

Section 523(a)(6) of the Bankruptcy Code provides that a discharge under section 727 of the Bankruptcy Code does not discharge an individual from any debt for willful and malicious

---

[86] *Johnson v. Steen* (*In re Steen*), 626 B.R. 469, 476 (Bankr. N.D. Tex. 2021); *see also Smith v. Hayden* (*In re Hayden*), 248 B.R. 519, 525 (Bankr. N.D. Tex. 2000).

[87] *Miller*, 156 F.3d at 602 (quoting *Greyhound Lines Inc. v. Thurston* (*In re Thurston*), 18 B.R. 545, 550 (Bankr. M.D. Ga. 1982) (quoting 3 Collier on Bankruptcy ¶ 523.14(3), 526-106 (15th ed. 1981))).

[88] *Steen*, 626 B.R. at 477; *see also Rainey v. Davenport* (*In re Davenport*), 353 B.R. 150, 199–200 (Bankr. S.D. Tex. 2006).

injury by the debtor to another entity or to the property of another entity.[89] NextGear has the burden of proving nondischargeability under section 523(a)(6) by a preponderance of the evidence.

To satisfy the requirements of section 523(a)(6), a creditor must prove that the injury inflicted was a deliberate or intentional injury by the debtor, not simply the byproduct of a deliberate or intentional act by the debtor.[90] Therefore, to satisfy the "willful and malicious injury" standard of section 523(a)(6), the Fifth Circuit has required proof of either (a) a subjective motive to cause harm on the part of the debtor, or (b) an objective substantial certainty of harm from the debtor's actions.[91] An objective substantial certainty of harm from the debtor's actions is established where "the defendant's actions, which from a reasonable person's standpoint were substantially certain to result in harm, are such that the court ought to infer that the debtor's *subjective* intent was to inflict a willful and malicious injury on the plaintiff."[92] On the other hand, a subjective motive to cause harm on part of the debtor is found when "a defendant acts 'deliberately and intentionally, in knowing disregard of the rights of another.'"[93]

NextGear alleges that Lorca committed willful and malicious injury to NextGear by (1) knowingly selling the SOT Vehicles, (2) failing to pay NextGear the proceeds of sale received on account of the SOT Vehicles, (3) paying other creditors and himself instead of NextGear, and (4) using multiple bank accounts to divert the sales proceeds away from NextGear. Lorca disputes the applicability of § 523(a)(6). He asserts that, but for the misrepresentations of Aziz and Aziz's

---

[89] 11 U.S.C. § 523(a)(6).

[90] *See Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

[91] *Miller*, 156 F.3d at 606.

[92] *Mann Bracken, LLP v. Powers* (*In re Powers*), 421 B.R. 326, 335 (Bankr. W.D. Tex. 2009) (emphasis in orig.).

[93] *Used Cars, Inc. v. Saaid* (*In re Saaid*), Adversary No. 19-05021-cag, 2020 WL 61833, at * 8 (Bankr. W.D. Tex. Jan. 6, 2020) (quoting *In re Gharbi*, No. 08-11023-CAG, 2011 WL 831706 (Bankr. W.D. Tex. Mar. 3, 2011), *aff'd*, 2011 WL 2181197 (W.D. Tex. June 3, 2011)).

obtaining of the MCA Loans, Reliance would have been able to make the payments owed to NextGear. Ultimately, the Court concludes that NextGear has successfully established the existence of willful and malicious injury with respect to the $85,000 Transfer, but not otherwise.

In the case of the $85,000 Transfer, Lorca knew that the funds were trust funds and knowingly and intentionally moved them out of Reliance and into his own possession and control. Thus, such conduct not only demonstrates a subjective motive to cause harm to NextGear, but also a substantial certainty of harm of NextGear.

With respect to the other amounts at issue in this case, however, neither the subjective nor objective prong of the test are satisfied. In the case of the 0313 Transfers, for example, the evidence presented did not convincingly establish that the funds at issue were, in fact, trust funds required to be paid to NextGear. Thus, while the transfers may have clearly been injurious to Reliance, it was not established that they were connected to NextGear and, hence, it also was not established that they were connected to the Judgment Debt. Separately, in the case of the Garnished Lender Financed Inventory Proceeds, while Lorca's actions in moving the funds around instead of immediately directing the funds to NextGear or coordinating with NextGear to otherwise protect the funds was clearly a breach or willful disregard of his fiduciary duty to NextGear, the evidence presented did not establish that Lorca's actions and omissions rose to the level of a subjective intent to cause harm to NextGear or that, objectively, the actions had a *substantial* certainty of causing harm to NextGear. Among other things, the evidence presented indicated that, at the time of learning about the impending garnishment risk, Lorca was unclear from where it was coming, the level of the risk involved, and whether the risk would ultimately go away. Only after the fact did Lorca learn about the MCA Loans and that it was the MCA lenders who initiated the

account garnishments. Thus, while again the failure to protect NextGear in such circumstances was grossly negligent, it cannot be said to have been willful and malicious.

For the above reasons, the Court finds that $85,000 of the Judgement Debt is nondischargeable under § 523(a)(6) of the Bankruptcy Code.

### *D. NextGear's Request for a Determination of Nondischargeability As to Its Fees and Expenses*

Finally, pursuant to the Complaint, NextGear requests that all attorneys' fees and expenses incurred by it in obtaining the Judgment and in pursuing this action also be determined to be nondischargeable pursuant to sections 523(a)(2)(A), 523(a)(4), and 523(a)(6). In this regard, pursuant to the Judgment, the State Court awarded the $20,000 in Judgment Fees. And at trial, NextGear established that it had incurred an additional $113,416.95 in fees and $7,035.20 in expenses, totaling $120,452.15 (collectively, the "**Adversary Fees and Expenses**"), in prosecuting this action.[94]

The text of the above-referenced provisions of § 523(a), in conjunction with the historical pedigree of the fraud, defalcation, and willful and malicious exceptions to discharge and the policy generally underlying the exceptions to discharge, all support the notion that awarded/awardable attorneys' fees and expenses determined to be connected to a nondischargeable debt owed by a debtor to a complainant are also subject to such exception to discharge.[95] That said, the debt at issue must necessarily include the attorneys' fees and expenses at issue. Thus, in those instances where a prior award of attorneys' fees and expenses has not been made, then because of the "American Rule" and the lack of any express provision within § 523(a) of the Bankruptcy Code

---

[94] *See* Pl.'s Exhs. Q and Q-2.

[95] *See Cohen v. de la Cruz*, 523 U.S. 213, 219-20 and 223 (1998) (explaining that the terminology "debt for" used throughout § 523(a) is intended to mean "debt as a result of," "debt with respect to," "debt by reason of," and the like, connoting broadly any liability arising from the specified object of the complaint).

providing for the recovery of attorneys' fees and expenses by a complaining creditor, the creditor must establish a basis for such recovery under another statute or by contract.[96]

Here, the Judgment Fees have already been awarded pursuant to the State Court Judgment. And while the entirety of the Judgment Debt has not been determined to be nondischargeable, such fees were obviously incurred in obtaining those portions of the Judgment Debt that are nondischargeable.

With respect to the Adversary Fees and Expenses, under the terms of the Guaranty, Lorca expressly agreed to pay all expenses paid or incurred by NextGear in endeavoring to collect on any Liabilities (which, by definition, includes the amounts awarded pursuant to the Judgment).[97] The Guaranty further specifies that such expenses include attorneys' fees, "including … those relating to bankruptcy."[98] Accordingly, NextGear has established an independent contractual basis for the recovery of attorneys' fees and expenses. With that in mind, the Adversary Fees and Expenses at in this case were incurred as a result, or by reason of, the nondischargeable debt at issue this case. Additionally, based upon the affidavit testimony of counsel for NextGear in relation to the Adversary Fees and Expenses and the Court's review of the underlying invoices,[99] the Court finds and concludes that NextGear has established that the attorneys' fees at issue are reasonable and were necessarily incurred (taking into account such factors as the rate structure applied, the time spent, the complexity of the issues, and the preclusion of the opportunity to work on other matters) and that the expenses at issue were actually and necessarily incurred in connection with the rendition of services.

---

96 *See Schwertner Backhoe Servs., Inc. v. Kirk (In re Kirk)*, 525 B.R. 325, 330 (Bankr. W.D. Tex. 2015).

97 *See* Guaranty § 2(a).

98 *Id*.

99 *See* Pl.'s Exhs. Q and Q-2.

Based upon the foregoing, the Court hereby determines that the Judgment Fees and the Adversary Fees and Expenses are also nondischargeable pursuant to §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the Bankruptcy Code.[100]

***CONCLUSION***

In conclusion, the Court determines that $1,059,191.51 of the debt owed by Lorca to NextGear is nondischargeable pursuant to § 523(a) of the Bankruptcy Code, as follows:

(a) In relation to NextGear's claim pursuant to § 523(a)(2)(A) of the Bankruptcy Code, a total of $229,452.15 of debt owed by Lorca to NextGear is nondischargeable (comprised of the $85,000 Transfer, the $4,000 Transfer, the Judgment Fees of $20,000, and the Adversary Fees and Expenses of $120,452.15);

(b) In relation to NextGear's claim pursuant to § 523(a)(4) of the Bankruptcy Code:

(1) With respect to the debt for defalcation while acting in a fiduciary capacity, a total of $970,191.51 of the debt owed by Lorca to NextGear is nondischargeable (comprised of the $85,000 Transfer, the Garnished Lender Financed Inventory Proceeds of $744,739.36, the Judgment Fees of $20,000, and the Adversary Fees and Expenses of $120,452.15);

(2) With respect to the debt for embezzlement, a total of $225,452.15 of the debt owed by Lorca to NextGear is nondischargeable (comprised of the $85,000 Transfer, the Judgment Fees of $20,000, and the Adversary Fees and Expenses of $120,452.15); and

(c) In relation to NextGear's claim pursuant to § 523(a)(6) of the Bankruptcy Code, a total of $225,452.15 of the debt owed by Lorca to NextGear is nondischargeable (comprised of the $85,000 Transfer, the Judgment Fees of $20,000, and the Adversary Fees and Expenses of $120,452.15).

All other nondischargeability requests made by NextGear pursuant to the Complaint will be denied. The Court will separately issue a final judgment in conformity with this Memorandum Opinion.

# # # END OF MEMORANDUM OPINION # # #

[100] In NextGear's Supplemental Pre-Trial Brief [Docket No. 71], NextGear also requests that it be awarded pre- and post-judgment interest on the Adversary Fees and Expenses. *See* Docket No. 71, at pp.2-4. Because NextGear did not assert an independent cause of action for the recovery of fees and expenses, however – instead limiting the claims asserted to the § 523 nondischargeability counts – the Court declines to provide such relief.